ESTATE OF GALLUN: GALLUN and others, Appellants, vs. TAX COMMISSION, Respondent.

*April 4—May 1, 1934.*

For the appellants there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Howard T. Foulkes* and *L. J. Burlingame* of counsel, all of Milwaukee, and oral argument by *Mr. Burlingame.*

For the respondent there was a brief by the *Attorney General, Herbert H. Naujoks,* assistant attorney general, *Neil Conway,* inheritance tax counsel, and *Austin J. Baird,* public administrator of Waukesha county, and oral argument by *Mr. Naujoks* and *Mr. Conway.*

FAIRCHILD, J. It is undisputed that Mrs. Gallun made gifts to her children within the two-year period preceding her death. At the time of her death the law relating to the tax on gifts provided that the transfers of property in contemplation of the death of the grantor should be taxed, and further provided that every such gift made within two years prior to the death of the grantor "of a material part of his estate, or in the nature of a final disposition or distribution thereof, . .. . shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section." Sec. 72.01 (3), Stats.

In determining whether the gifts made were made in contemplation of death, the following facts are of importance: The donor died testate on July 15, 1932. She is survived by her husband and four children. She left an estate valued at $657,140.95. By the terms of her will she bequeathed the household furniture to her husband, and the balance of her estate to her four children in equal parts. In her lifetime she made substantial gifts to her children. Between December, 1924, and July, 1929, she gave to her three oldest children certain insurance policies on the life of her husband and made to them annual cash gifts. She also gave to her oldest child, Mrs. Pritzlaff, a parcel of land for the purpose of establishing a home. The aggregate value of the transfers during this period of time, and the donees thereof, are as follows: Mrs. Pritzlaff, $108,590; Edwin Gallun, $46,319.95; Albert Gallun, $46,623.26.

The learned counsel for the Tax Commission do not contend that the gifts just described were made in contemplation of death, and concede that they are not subject to an inheritance tax. But they do contend that gifts made after July, 1929, and between May 22, 1930, and July 20, 1931, were made in contemplation of death and are subject to the tax.

Sec. 72.01, Stats., creates a presumption that gifts made within two years preceding death of the donor are made in contemplation of death. This presumption, however, may be rebutted, and when evidence shows that such gifts were not made in contemplation of death, the presumption ceases to exist; and the challenged acts stand free from the burden provided for in the law for gifts made in contemplation of death and in the nature of a final disposition or distribution. As was said in *Will of Harnischfeger,* 208 Wis. 317, 242 N. W. 153, 243 N. W. 453:

". . . a presumption that such gift was made in contemplation of death arises which, in the absence of credible evidence to the contrary, permits the conclusion that such gift was made in contemplation of death. Its effect is to place upon the donee the burden of showing that such gift was not made 'in contemplation of death.' Such presumption has no probative weight as against evidence to the contrary, but does create a *prima facie* case for the party in whose favor it exists. 1 Jones, Comm. on Evidence (2d ed.), p. 60, § 30; *Stumpf v. Montgomery,* 101 Okla. 257, 226 Pac. 65; *Coleangelo v. Coleangelo,* 46 R. I. 138, 125 Atl. 285; *United States v. Wells,* 283 U. S. 102, 51 Sup. Ct. 446."

The donees of the gifts admitted the times of the gifts, the date of the donor's death, and met the presumption with evidence which may be briefly summarized as follows: Mrs. Gallun, for a number of years prior to her death, had a very substantial annual income varying from $68,000 to considerably more, and in the year of 1929 it reached the sum of approximately $98,000. During this period of time Mrs. Gallun's husband had a substantial income, making it unnecessary for her to contribute anything to the family expenses. Prior to 1923 Mrs. Gallun purchased life insurance from her husband which he had taken out on his life. The face value of this insurance was $550,000, having a present

cash surrender value. In 1927 and prior thereto she had given $125,000, face value, of this insurance to each of her three oldest children. On June 11, 1930, she transferred a similar amount of the life insurance to her youngest child. The children paid the premiums on their policies after the assignment, and Mrs. Gallun had no further interest therein. In the years 1927, 1928, and 1929 she gave an allowance to each of the three oldest children of $4,500. In 1930 and 1931 she continued the allowance, but at a reduced sum, to wit, $4,400. During those two years, 1930 and 1931, she made an allowance of $4,200 to her youngest child, who had been recently married. In 1929 Mrs. Gallun gave to her oldest child real estate of considerable value for the purpose of helping to establish her in a home of her own. In 1929 she made plans for the giving of presents to the other children. It appears that she wanted to enable them to have homes on a similar scale of comfort to that to which she had contributed in the case of her oldest child. Edwin and Albert purchased homes, and the youngest child, who had received one as a wedding present from her father, was not required to buy one.

There can be no serious question but that the idea of allowances to the children and such presents as were arranged for in 1929, were not made in contemplation of death. In fact, all the gifts under consideration here, when the amount thereof is considered in connection with the income that the donor had, suggest that they were not made in contemplation of death. Out of a total of $54,150 in gifts made within two years before her death, $34,800 were for annual allowances to the children made in pursuance of a custom that had extended over a number of years. Excepting for these annual allowances, the only gifts made within the two-year period prior to death were made July 16, 1930, and Mrs. Gallun died July 15, 1932. The manner of making the gifts and the reasons disclosed indicate that the promptings of the giving were connected with the expectation of living

to enjoy the pleasure that would come from seeing her children comfortably and well situated. There is no testimony tending to show that the deceased had any premonition of death or consciousness of any affliction that might result in death. It was said in the case of *United States v. Wells, supra:*

". . . The court held that 'the immediate and moving cause of the transfers was the carrying out of a policy, long followed by decedent in dealing with his children, of making liberal gifts to them during his lifetime.' The court regarded the transfers in question as 'a continuation and final consummation of such policy. . . .' "

As in that case, so it seems here, when due consideration is given to the plan carried out by the donor, to the amount of her income, and to the amount of the estate which she retained and disposed of by her last will and testament, that not only was there no fear at the time of the transfer that death was near at hand, "but the motive for the transfers brought them within the category of those which . . . are intended by the donor 'to accomplish some purpose desirable to him if he continues to live.' "

In addition to this convincing evidence which has in no way been overthrown by the state, there was testimony that her family physician noticed a change in her health during the summer of 1931. This was followed by an offer by appellants to produce Dr. Egan, the physician of Mrs. Gallun, as a witness. The court received testimony to the effect that up to June 13, 1930, her physical condition was not such that there would be any anticipation of death, and that it was not until late in 1931 that the seriousness of her condition became known. The testimony, however, was taken subject to the objection of the state, and eventually ruled not admissible. This ruling was based on the trial court's construction of sec. 325.21, Stats., which reads:

"No physician or surgeon shall be permitted to disclose any information he may have acquired in attending any

patient in a professional character, necessary to enable him professionally to serve such patient, except only . . . (4) with the express consent of the patient, or in case of his death or disability, of his personal representative or other person authorized to sue for personal injury. . . ."

It is generally held that the words "personal representatives" mean the executor or administrator of the deceased. 23 C. J. p. 996, § 2; *Moyer v. Oshkosh,* 151 Wis. 586, 139 N. W. 378; *Atchison, T. & S. F. R. Co. v. Berkshire* (Tex. Civ. App.), 201 S. W. 1093; *Casey v. Hoover,* 197 Mo. 62, 94 S. W. 982; *Atkinson v. Washington and Jefferson College,* 54 W. Va. 32, 46 S. E. 253. The rule of evidence prohibiting the admission of a physician's testimony is. one which did not exist at common law. While the exclusion of such evidence may serve some good purpose under certain circumstances, it may also easily become an instrument of injustice, and a construction of this statute consonant with its express intent and purpose requires the receiving of that evidence when consented to by' the executor or the administrator. The dangers attending any other construction of such a statute are shown by the circumstances of the case of *Maine v. Maryland Casualty Co.* 172 Wis. 350, 178 N. W. 749, and are effectively expressed in the dissenting opinion by Mr. Justice OWEN in that case. The statute was amended in 1921 to prevent a repetition of the result reached by this court in the *Maine Case.* It was further liberalized in 1927, and the reasonable interpretation of the legislative intent, in view of the history of the statute and the remedial purpose of the legislation, is to bring the Wisconsin rule into accord with the general view that the privilege is personal to the client or patient and may be waived by him or after his death by his legal representative. 5 Jones, Comm. on Evidence (2d ed.), p. 4194, § 2198; *Fraser v. Jennison,* 42 Mich. 206, 3 N. W. 882; *Groll v.*

*Tower,* 85 Mo. 249; *Morris v. Morris,* 119 Ind. 341, 21 N. E. 918; *Olson v. Court of Honor,* 100 Minn. 117, 110 N. W. 374.

*By the Court.*—The part of the judgment appealed from is reversed, and cause remanded with directions to modify the judgment in accordance herewith.